UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERALD BYRD and
DEVI LOREN SMITH,

    Plaintiffs,

v.

HEIDI WASHINGTON, *et al.*,

    Defendants.
_____/

Case No. 1:20-cv-176

Hon. Paul L. Maloney

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by two prisoners in the custody of the Michigan Department of Corrections (MDOC), Gerald Byrd ("Byrd") and Devi Loren Smith ("Smith"), collectively referred to as "plaintiffs". This matter is now before the Court on defendant Heidi Washington and Cheryl Groves' motions for summary judgment for lack of exhaustion (ECF Nos. 24 and 33, respectively). The Court will also review plaintiffs' claim that defendants Heidi Washington, Cheryl Groves and Access Corrections ("Access") violated their rights under the Fifth Amendment's Takings Clause alleged in their amended complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 42 U.S.C. § 1997e(c).

    **I.**    **Background**

Plaintiffs' original complaint was directed at MDOC employees Director Heidi Washington ("Washington") and Contract Manager Cheryl Groves ("Groves"); Lakeland Correctional Facility (LCF) employees Lieutenant Unknown Tagett ("Tagett"), and trainee correctional officers Unknown Part(y)(ies) #1 ("Unknown Party #1"), and Unknown Hill ("Hill");

1

and MDOC vendor Access. *See* Opinion (ECF No. 5, PageID.48-49). The Court summarized the underlying facts in its opinion screening the original complaint as follows:

> Plaintiffs allege that their music and their Access MP3 music players have been taken from them. Plaintiffs Byrd and Smith each had MP3 players, purchased through Access Corrections, for use in LCF. To add music to their MP3 players, they paid $1.49 per song and used Access MP3 kiosks to transfer their purchased music onto their players. By 2016, Plaintiff Smith had purchased 322 songs, and Plaintiff Byrd had purchased 247 songs, apparently playable only on their Access MP3 players. Plaintiffs allege that, in 2016, after MDOC discontinued its contract with Access, MDOC and Access placed a 10-year expiration on all previous music purchases. After 10 years, the music—and consequently the Access MP3 players—would cease to function.
>
> Plaintiffs further allege that on June 18, 2019, LCF personnel conducted a shakedown and took both Plaintiffs' MP3 players. At the start of the shakedown, Plaintiffs were listening to their MP3 players. They were ordered to leave their devices and exit the unit. Plaintiffs allege that they were able to identify that Defendants Tagett and Hill were among the LCF staff who conducted the shakedown of Plaintiffs' unit. When Plaintiffs returned after the shakedown, their devices were gone. From other prisoners, Plaintiffs learned that the MP3 players had been removed before the first two prisoners returned to the unit. Assistant Residential Unit Supervisor Beaman (not a defendant) explained to Plaintiffs that some MP3 players were taken because corrections officers could not power on the devices during the shakedown. Beaman told Plaintiffs that their devices would be returned in the subsequent days. However, Plaintiffs never received their MP3 players. In September 2019, Plaintiffs each filed claims for the loss of their MP3 players and downloaded songs with the State Administrative Board. The State Administrative Board denied both claims on February 3, 2020.
>
> Plaintiff Byrd further alleges that, because his MP3 player has been taken, his religious exercise has been burdened. Plaintiff Byrd alleges that he practices the Ifa religion. Plaintiff Byrd alleges that, "[c]entral to Ifa practice is, invocation of the Divine Messenger deity called 'Esu.' Esu is invoked through praise songs called oriki." (Compl., ECF No. 1, PageID.7.) "[C]orrect tone, pitch and pronunciation of the Yoruba words of the oriki is necessary to strengthen the invocation." (*Id.*, PageID.12.) Among the music Plaintiff Byrd had on his MP3 player was an oriki praise song by Ella Andall. Before his MP3 player was taken, Plaintiff Byrd listened to Ella Andall's song every time he invoked Esu. Now, Plaintiff Byrd is unable to invoke Esu by listening to oriki. Plaintiff Byrd asserts that he has requested JPay Media, MDOC's new vendor, add oriki to their music catalog, but JPay has not added any to date. Consequently, Plaintiff Byrd alleges that he "has not alternative means of utilizing oriki songs for invoking Esu." (*Id.*)

> Plaintiffs allege both that their MP3 players were taken from them and that their music was set to expire in 10 years, without compensation or due process in violation of the Fourteenth Amendment. Plaintiff Byrd further alleges that his oriki praise songs have been taken from him and not replaced, in violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA) [42 U.S.C. § 2000cc-1 *et seq*.].

Opinion (ECF No. 5, PageID.49-50).

Although plaintiffs' complaint referred to the Fifth Amendment (Compl. at PageID.9), it appears the Court construed their "Takings claims" as violations of the Fourteenth Amendment. *See* Opinion at PageID.52-53 ("Plaintiffs allege that, in 2016, after they had purchased hundreds of songs, their music purchases were set to expire after 10 years thus depriving them of their property without due process" and "Plaintiffs further allege their Fourteenth Amendment due process rights have been violated because their MP3 players have been taken without compensation".). Ultimately, the Court dismissed plaintiffs' claims against defendants Tagett, Hill, Unknown Party #1, and Access. Order (ECF No. 6). The Court also dismissed plaintiffs' due process claims against defendants Washington and Groves. *Id*. The only claims to survive initial screening were plaintiff Byrd's RLUIPA claims alleged against defendants Washington and Groves. *Id*. Because plaintiff Smith's claims were dismissed in their entirety, the Court dismissed him from the lawsuit. *Id*.

Plaintiffs moved for reconsideration of the original complaint (ECF No. 13) and to file an amended complaint (ECF No. 16). Because plaintiffs could amend their complaint as a matter of course pursuant to Fed. R. Civ. P. 15(a)(1), the Court directed the Clerk's Office to file the amended complaint (ECF Nos. 16-1 and 20). *See* Order (ECF No. 19). While plaintiffs' motion for reconsideration addressed the claims in their original complaint – which is now moot – the Court reviewed the similar allegations made in the amended complaint and re-affirmed dismissal of the Fourteenth Amendment Due Process claims asserted against defendants Tagett,

Hill and Unknown Party #1. *See* Order (ECF No. 19, PageID.123-125). With respect to plaintiffs' claims for relief under the Fifth Amendment's Takings Clause, the Court concluded that "at this juncture, the Court determines that plaintiffs have sufficiently alleged a Takings claim against Defendants Washington and Groves for the loss of their music caused by the change in vendor." *Id*. at PageID.125. The Court reinstated Smith in the case and "Plaintiffs' claim for the loss of their music after the 10-year expiration date." *Id*. at PageID.127.

In the amended complaint, plaintiff Byrd re-alleged a RLUIPA claim against former defendants Tagett, Hill, and Unknown Party #1 for taking Byrd's MP3 player which included "a song which is integral to his religious exercise" and "substantially burdened his religious exercise." Amend. Compl. at PageID.141. Byrd seeks compensatory damages from these three former defendants under RLUIPA. *Id*. at PageID.143. Byrd did not allege a RLUIPA violation against either defendant Washington or Groves. *Id*. at PageID.141-142. However, Byrd seeks relief under RLUIPA against Washington and Groves in the form of an injunction ordering them "to have JPay Media to[sic] add oriki songs for the Orisa 'Esu' and other Orisa for Plaintiff Byrd's religious exercise." *Id*. at PageID.143. Ultimately, the Court concluded that,

> In sum, because Plaintiff Byrd cannot maintain an RLUIPA claim for money damages against any of the Defendants, he can proceed only for prospective injunctive or declaratory relief. Plaintiff Byrd's RLUIPA claims remain against Defendants Washington and Groves. Consequently, Plaintiff's RLUIPA claims seeking injunctive or declaratory relief against Defendants Tagett, Hill, and Unknown Part(y)(ies) #1 are superfluous.

Order (ECF No. 19, PageID126).

### II. Defendant Access

The Court's order on reconsideration (ECF No. 19), did not address plaintiffs' claims against defendant Access. In the amended complaint, plaintiffs Byrd and Smith appear to include Access as a party to the alleged Fifth Amendment Takings claim. In this regard, plaintiffs

4

alleged that Access "was a private company that had a contract with the MDOC to provide digital musical program services to prisoners during the events described in this complaint," and that Access "was a private party jointly participating with Defendants Washington and Groves in selling MP3 Players and song downloads advertised as permanent purchases then creating and implementing a procedure that effected a taking without just compensation, therefore, they were acting under color of state law and are liable under 42 U.S.C. § 1983." Amend. Compl. (ECF No. 20, PageID.130, 138). An issue exists as to whether Access, a private corporation, is a state actor for purposes of plaintiffs' Fifth Amendment Takings claim brought pursuant to § 1983.[1] However, for purposes of this report, the undersigned will construe the amended complaint as alleging that Access was a state actor under § 1983.

### III.     Fifth Amendment Takings claims

Upon further review of the amended complaint, the undersigned concludes that plaintiffs have failed to state a Fifth Amendment Taking claims against defendants. In addition, even if plaintiffs had alleged Taking claims, they cannot obtain equitable relief against defendants, and the claims for monetary damages are barred by sovereign immunity. The Court performs this review pursuant to 28 U.S.C. § 1915(e), which provides in pertinent part that, "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . (B) the action . . . (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(ii) and (iii).

---

[1] *See Mendoza v. Inch*, No. 4:18CV66-RH/CAS, 2019 WL 1901811 at *8 (Feb. 20, 2019), *R&R adopted*, 2019 WL 1236056 (N.D. Fla. March 17, 2019) ("At this stage of the litigation, it appears that Plaintiff has sufficiently alleged facts upon which to find that the private Defendants [Access Corrections and Keefe Group] were acting under color of state law."); *Aicher v. Ali*, No. CV 15-0552 JB/SCY, 2016 WL 3129628 at *5 (D.N.M. May 31, 2016) ("Aicher's Complaint does not allege that Access Corrections was acting under color of law as a state actor when it failed to deliver Aicher's mp3 player, accessory power cord, or prepaid music.").

In reviewing a complaint to determine whether it states a claim for relief under 28 U.S.C. § 1915(e)(2)(B)(ii), the Court applies the plausibility standard set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  *See Hill v. Lappin*, 630 F.3d 468, 471 (6th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (internal citations omitted). In making this determination, the complaint must be construed in the light most favorable to the plaintiff, and its well-pleaded facts must be accepted as true.  *Morgan v. Churchs Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

Upon further review, the Court concludes that the allegations in plaintiffs' amended complaint fail to state a claim for relief under the Fifth Amendment.

> The Takings Clause of the Fifth Amendment of the United States Constitution, made applicable to the States through the Fourteenth Amendment, *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 239, 17 S.Ct. 581, 585, 41 L.Ed. 979 (1897), provides: "[N]or shall private property be taken for public use, without just compensation." One of the principal purposes of the Takings Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960).

*Dolan v. City of Tigard*, 512 U.S. 374, 383-84 (1994) (footnote omitted).

Here, the alleged taking arose from the MDOC's termination of a vendor contract with Access and plaintiffs' eventual loss of access to downloaded music files in 2027. According to plaintiffs,

> Defendant Washington, as policy-maker and sole possessor of authority to implement procedure for the MDOC, along with Defendants Groves and Access, to effectuate termination of the contract, implemented a policy and/or procedure

6

> that allowed prisoners who had purchased Access/Keefe MP3 players, to connect their payer to the Access kiosk to allow for a 10-year mortality timer to be installed until March 1, 2017, when the Access kiosks would be turned off/disabled. The mortality timer, when expired, renders the MP3 players inoperable. On February 1, 2017, the purchase of song downloads for the MP3 players was discontinued pursuant to the policy and/or procedure of Defendants Washington, Groves, and Access.

Amend. Compl. at PageID.131.

Plaintiffs allege that the "[Access] MP3 song downloads were advertised as permanent purchases by Defendants Access, Groves, and Washington" and that the MDOC "took a cut" of the sales of MP3 players and song downloads. *Id*. According to plaintiffs, "implementing the 10-year mortality timer altogether, in lieu of removing the mortality timer, was done to compel Plaintiffs, and other prisoners, to re-purchase the Access song downloads when they expire, from JPay Media, the MDOC's new media device and song download vendor." *Id*. Plaintiffs further alleged that:

> On March 1, 2017, Plaintiffs were allowed to purchase JPay JP5 Mini tablets. Those who owned Access/Keefe MP3 Players, such as Plaintiffs, were given the option to turn the Access/Keefe MP3 player in for a JP5 Mini Tablet, being sold for $19.99 plus tax at the time, and $20.00 credit to their JPay Media account for song download purchases, instead of eventually losing their music at the expiration of the mortality timer.

*Id*. at PageID.131-132. Plaintiffs claim that they would have experienced a loss of hundreds of dollars under the trade-in option, because the total value of that option (approximately $40.00) would not cover the original cost of their Access MP3 players and previously downloaded songs. *Id*. at PageID.132. Neither plaintiff participated in this option. A few years later, their MP3 players were confiscated by MDOC staff during a shakedown on June 18, 2019. *Id*. at PageID.134-135.

In September 2019, both plaintiffs filed claims with the Michigan State Administrative Board (SAB) for the loss of their MP3 Players and downloaded music files. *Id*. at PageID.135. Byrd claimed the loss of 247 downloads while Smith claimed the loss of 322

7

downloads. *Id*. Those claims were denied on February 3, 2020.[2] *Id*. Based on the amended complaint, the property at issue in plaintiffs' Takings claim is the loss of their downloaded music due to the 10-year "mortality timer":

> (37) The 10-year mortality timer placed on the players, when they expire, will still result in the deprivation of the [sic] both Plaintiffs' songs even if Plaintiffs were given new Access/Keefe MP3 players with mortality timers on them.
>
> (38) The mortality timer procedure implemented by Defendants Washington, Access, and Groves was a bait and switch tactic that will result in an eventual involuntary forfeiture of both Plaintiffs' music, even if their Access/Keefe MP3 players are replaced.

*Id*.

Plaintiffs appear to allege that they suffered the taking on February 1, 2017, when the 10-year mortality timer was placed on their MP3 players. However, plaintiffs would not suffer any injury from the alleged taking until February 1, 2027, the date on which they would no longer be able to access the songs downloaded on their MP3 players. Plaintiffs ask for $5,000.00 in punitive damages against each defendant and a court order directing defendants to transfer the lost songs to their respective JPay JP5 multimedia tablets. Plaintiffs also ask for alternative relief in the form of a court order directing defendants to remove the 10-year timer from the songs on their Access/Keefe MP3 Players – even though plaintiffs no longer possess these MP3 players. Amend. Compl. at PageID.143.

Plaintiffs' prisoner property claims do not implicate a Fifth Amendment violation. Plaintiffs attempt to present their claims as Fifth Amendment violations, alleging that "[t]his taking of Plaintiffs' songs, or the money spent on them alternatively, does not meet the just compensation requirement, therefore violating the U.S. Constitution Fifth Amendment's Takings Clause." *Id*. at

---

[2] The Court notes that plaintiffs were advised of the SAB's decision on November 5, 2019. *See* SAB Letter to Byrd (PageID.272); SAB Letter to Smith (PageID.301).

PageID.140. However, plaintiffs do not allege that the State of Michigan, through defendants Washington, Groves and Access, took their music downloads for a "public use." *See id.* at PageID.138-140. On the contrary, plaintiffs admit that there was no attempt by the State of Michigan to acquire their property for the benefit of the public, alleging that "[t]his taking was done solely for private reasons as there was not public use articulated for the taking." Amend. Compl. at PageID.11.

"A prisoner property claim only implicates the Fifth Amendment Takings Clause where the prisoner alleges that prison officials took his personal property and converted it for public use without just compensation." *Roop v. Ryan*, No. CV 12-0270-PHX-RCB, 2012 WL 1068637 at *3 (D. Ariz. March 29, 2012). *See, e.g., Allen v. Wood*, 970 F. Supp. 824, 831 (E.D. Wash. 1997) (prisoner cannot state a Fifth Amendment claim for rejection of his mail where he "fails to show that property he was authorized to receive was taken for public use"); *Hines v. Ferguson*, No. 19-CV-3139, 2019 WL 3504239 at *1 (E.D. Pa. July 31, 2019) (allegations related to the destruction of inmate property during the transfer of prisoners do not implicate the Fifth Amendment Takings Clause where nothing in the complaint suggests that the prisoner's property was taken for a public purpose).

In addition, plaintiffs requesting equitable relief is not available in a takings claim action "since by definition the government has the legal authority to take the property for public use, and the issue to be litigated is the extent and nature of the just compensation due." *Abney v. Alameida*, 334 F. Supp. 2d 1221, 1229 (S.D. Cal. 2004). *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking.") (footnote omitted).

Even if plaintiffs could allege a loss of property under the Fifth Amendment's Takings Clause, any claim for monetary damages – the remedy available to them in a Takings claim – would be barred by the Eleventh Amendment. In *Ladd v. Marchbanks*, 971 F.3d 574 (6th Cir. 2020), *pet. cert.* filed No. 20-912 (Jan. 4, 2021), the Sixth Circuit held that a state's sovereign immunity protects it from a takings claim for damages filed in federal court:

> "It is not in the power of individuals to call any state into court." 3 Debates on the Constitution 533 (J. Elliot ed. 1876) (James Madison). This principle of state sovereign immunity was foundational to the formation of our republic. Certain constitutional provisions and acts of Congress have abrogated the States' sovereign immunity—and of course the States may waive their immunity at their pleasure. But by and large the States remain protected from private civil suits. We held as much for takings claims brought against states in federal court. *DLX, Inc. v. Kentucky*, 381 F.3d 511, 526 (6th Cir. 2004). So when the plaintiffs here brought a takings claim against an Ohio official and Ohio asserted its sovereign immunity as an affirmative defense, the district court dismissed the suit for lack of subject matter jurisdiction. Because *DLX* remains the law of this circuit, we AFFIRM.

*Ladd*, 971 F.3d at 576. The court further explained:

> In *DLX, Inc. v. Kentucky*, we held that the States' sovereign immunity protects them from takings claims for damages in federal court. 381 F.3d at 526, *overruled on other grounds by San Remo Hotel, L.P. v. City and County of San Francisco*, 545 U.S. 323, 125 S.Ct. 2491, 162 L.Ed.2d 315 (2005). True, the plaintiffs in *DLX* sued the Commonwealth of Kentucky, and Plaintiffs here sued an officer of the State of Ohio. But this formality can't help plaintiffs bypass sovereign immunity " 'when the state is the real, substantial party in interest,' as when the 'judgment sought would expend itself on the public treasury or domain, or interfere with public administration.' " *Stewart*, 563 U.S. at 255, 131 S.Ct. 1632 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)) (internal quotation marks and citation omitted). Plaintiffs sued Marchbanks in his official capacity, so the Ohio treasury is responsible for any judgment against him. Thus, Ohio's sovereign immunity extends to Marchbanks. And we haven't overruled *DLX* as an en banc court. So "unless a decision of the United States Supreme Court mandates modification[,]" *DLX* forecloses Plaintiffs' claim for damages under 42 U.S.C. § 1983. *United States v. Moody*, 206 F.3d 609, 615 (6th Cir. 2000). . . .
>
> Without a Supreme Court case that mandates modification of *DLX*'s holding, it binds us. Thus, Ohio's sovereign immunity protects Marchbanks from Plaintiffs' § 1983 claim for damages and erodes our subject matter jurisdiction.

*Id.* at 578, 580.

For all of these reasons, plaintiffs' Fifth Amendment Takings claims alleged against defendants Washington, Groves and Access should be dismissed for failure to state a claim upon which relief can be granted. 28 U.S.C. § 1915(e)(2)(B)(ii) and (iii).

### IV.     Defendants' motion for summary judgment

In their motions for summary judgment, defendants contend that plaintiffs did not exhaust their federal claims against Washington and Groves prior to filing this lawsuit. While the undersigned concludes that plaintiffs cannot claim relief under the Fifth Amendment Takings Clause, this report will address defendants' arguments with respect to exhaustion of those claims as set forth in their motions. Because defendant Groves adopted the arguments set forth in defendant Washington's brief,[3] the Court will consider all of the exhaustion arguments as applicable to both defendants.

#### A.     Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

---

[3] *See* Groves Brief (ECF No. 34, PageID.362-363); Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion").

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B. Lack of Exhaustion

### 1. Exhaustion requirement

Defendants contend that plaintiffs failed to exhaust their claims. The PLRA provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

### 2.     MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.[4]

---

[4] The MDOC revised its July 9, 2007 grievance policy on March 18, 2019. *See* Policy Directive 03.02.130 (eff. March 18, 2019). Plaintiffs' amended complaint alleged incidents which occurred between 2017 and 2020, meaning that some claims would be subject of the 2007 version of the grievance policy while other claims would be subject to the 2019 version of the policy. For purposes of this report, it does not matter when plaintiffs' claims arose, because the

13

### 3. Discussion

#### a. Plaintiffs' property claims vs. plaintiffs' grievances

##### i. The property claim procedure

As an initial matter, defendants contend that plaintiffs' property claims filed with SAB do not serve to exhaust their federal claims under the PLRA. Defendant Washington's Brief (ECF No. 25, PageID.159-160). Plaintiffs proceeded under the administrative procedure allowing prisoners to make claims of less than $1,000.00 against the State of Michigan under MDOC Policy Directive 03.02.131, which "sets out a procedure for prisoners to file a Form DTMB-1104 'Claim Against the State of Michigan for Personal Losses of Less than $1,000'". Policy Directive 03.02.131 (ECF No. 25-6, PageID.266). The MDOC has a specific operating procedure for reviewing claims presented on Form DTMB-1104. *See* Operating Procedure 03.02.131 (ECF No. 25-7).

Plaintiffs did not file their property loss claims when defendants commenced the 10-year timer on February 1, 2017, nor when the MDOC confiscated their Access MP3 players on June 18, 2019. Rather, plaintiffs filed their claims in September 2019, shortly after the Business Office advised plaintiffs that they could not obtain replacements for the MP3 players.

Byrd filed his claim on September 6, 2019, identifying a loss date of June 18, 2019, and a value of $494.88. *See* Byrd Claim (ECF No. 25-8, PageID.275). The claim form required Byrd to state whether the property was "Lost, Stolen or damaged" and to value each "property item." *Id*. In his claim, Byrd stated that his property was "lost" and valued the MP3 player at $129.32 and the 247 downloaded songs at $365.56, for a total loss of $494.88. *Id*. In an attachment to his claim, Byrd stated that this loss constituted a "Taking without just compensation" in

---

operative elements of the 2019 version of the policy (*i.e.*, the requirements and procedures for filing grievances) are the same as set forth in the 2007 version. *See* Policy Directive 03.02.130 (eff. March 18, 2019) (¶¶ Q, S, W, DD, HH).

violation of his due process rights under the Fifth and Fourteenth Amendments and the "Takings Clause" of the Fifth Amendment. *Id*. at PageID.276.

Smith filed his claim on September 12, 2019, identifying a loss date of June 18, 2019, and a value of $609.01. *See* Smith Claim (ECF No. 25-9, PageID.304). In his claim, Smith stated that his property was "lost" and valued the MP3 player at $116.55, the outlet adapter at $15.90, and that 322 lost songs at $476.56, for a total taking of $609.01. *Id*. Smith's also had an attachment which made similar statements of the due process and Takings Clause claims. *Id*. at PageID.305. Both claims were denied on November 5, 2019. *See* SAB Letter to Byrd (PageID.272); SAB Letter to Smith (PageID.301).[5]

### ii.     The grievance procedure

While Policy Directive 03.02.131 provides a procedure for prisoners to claim monetary compensation for lost, stolen or damaged prisoner property, Policy Directive 03.02.130 provides the procedure for prisoners "seeking redress for alleged violations of policy and procedure or unsatisfactory conditions of confinement." *See* Policy Directive 03.02.130 (eff. July 9, 2007) and (eff. March 18, 2019). As discussed, *supra*, Policy Directive 03.02.130 provides the mechanism for prisoners to file and exhaust grievances for purposes of the PLRA. As the Supreme Court observed while reviewing Michigan's grievance procedure under Policy Directive 03.02.130:

> Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust." The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

---

[5] The Court notes that plaintiffs' DTMB-1104 forms included the following release of claims: "I understand and agree that if this claim or any part thereof is approved or denied, I fully release and discharge the State of Michigan, its departments or agencies, from all other causes of action, liabilities, and damages I may have pertaining to the items identified in this claim." *See* Byrd claim at PageID.275; Smith claim at PageID.304. Defendants do not rely on this release.

*Jones*, 549 U.S. at 218.

To explain the differences between the SAB claims process and the MDOC's grievance process, defendants presented an affidavit from Richard Russell, Manager of the Grievance Section in the Office of Legal Affairs of the MDOC, which stated in pertinent part:

> The SAB claims process under MDOC P.D. 03.02.131 is limited to claims of property loss worth less than $1,000, and is not a forum to resolve any other claims a prisoner may have due to the circumstances which resulted in the loss of that property, such as claims arising out of the state or federal constitutions, state or federal law, MDOC or facility policies or procedures, or contractual obligations; generally, to resolve these other claims, a prisoner must pursue a grievance through the three-step grievance process set forth by MDOC P.D. 03.02.130, or through the misconduct hearing process set forth by MDOC P.D. 03.03.105, "Prisoner Discipline," if the loss arose out of circumstances which resulted in a misconduct ticket being issued against the prisoner.

Russell Aff. (ECF No. 40-1, PageID.399). The Court should give substantial deference to the MDOC's interpretation of those Policy Directives. *See Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations."). For these reasons, the Court looks to plaintiffs' grievances filed pursuant to Policy Directive 03.02.130 to determine exhaustion.

      **b.**    **Plaintiffs' grievances**

Defendants point out that while Byrd has filed numerous grievances since 2017, none of these grievances relate to the alleged "taking" of his MP3 music files by MDOC administrators. Defendant Washington's Brief at PageID.160. Defendants also point out that Smith has not pursued any grievances through Step III of the MDOC grievance process. *Id*. at PageID.160-161. Based on this record, defendants contend that plaintiffs failed to properly exhaust any of their claims alleged against defendants.

16

In their response, plaintiffs point out that they did file grievances "about the 10-year mortality timer claim, that were rejected at Step I for raising non-grievable issues." Plaintiffs' Response (ECF No. 27, PageID.324). *See* Byrd Grievance, LCF 19-09-00876-027B ("876") (ECF No. 27-4, PageID.338-339); Smith Grievance, LCF 19-09-00870-027B ("870") (ECF No. 27-5, PageID.341-342).

Byrd relies on grievance 876, which was directed at the "Business Office" for an incident which occurred on September 5, 2019. On that date, Byrd kited the Business Office about whether he could purchase a new Access SEC-100 MP3 Player to use the 247 songs he purchased, and the office replied that "The only player currently available is the JP5 through JPay." Byrd's grievance sets out his claim in detail and is reproduced below:

> The issue being grieved is the Business Office's refusal to allow me to purchase a new Access SEC MP3 Player to use my music that I purchased during MDOC's contract with Access. My player was taken, through no fault of my own during a Major Shakedown on June 18, 2019 (**NOT THE ISSUE BEING GRIEVED, DO NOT CONFUSE IT AS THE ISSUE BEING GRIEVED**), and I sought to purchase a new one in the event my DTMB-1104-P Claim was denied and I was told that I could only purchase a JP5 Tablet. The result of not being allowed to purchase a new SEC-100 MP3 Player to use my Access song downloads is that my rights under the Due Process Clause and Just Compensation for my property being taken under the Takings Clause of the Fifth Amendment and the Fourteenth Amendment of the U.S. Constitution are being violated. This is a taking of property because I cannot use the music that I purchased due to the prohibition on purchasing new Access MP3 Players implemented by Director Heidi Washington, Contract Manager Cheryl Groves, Access/Keefe, Governor Snyder, and Business Office Staff Boder. The 10-year timer, which after expiration, all of my music will be taken, also constitutes a taking because the songs were advertised as permanent purchases. As a remedy, I would like to be authorized to purchase a new SEC-100 MP3 Player without a expiration date for my music, in the event my DTMS-1104-P is denied.

Byrd Grievance 876 (emphasis in original).

Smith's grievance 870 made a similar claim. According to Smith, on September 5, 2019, he sent a kite to the Business Office to learn whether he could order a new Access MP3

17

Player to use his old music purchased through Access. In response to this kite, "I was told that I could not and that I had to order a JP5 Tablet and I couldn't order an Access MP3 Player." Smith's grievance states as follows:

> The issue being grieved is the Business Office informing me that I can not purchase another Access AMP'D MP3 Player after my Access AMP'D MP3 player was taken during a major shakedown conducted during June 1, 2019. As a result of me being prohibited from purchasing another Access MP3 Player, I cannot listen to the 362 songs that I purchased when the MDOC has a contract with Access allowing me to purchase MP3 song downloads. This refusal, coupled with the mortality-timer for my songs that expires in 2027, constitutes a taking of my property for the state's use without just compensation, violative of the U.S. Const. Fifth Amendment's Takings Clause and Due Process. The song purchases were advertised as permanent purchases and now, due to the confiscation of my player on June 18, 2019, I cannot use the music. I should be allowed to purchase another Access MP# Player without a mortality-timer so that my music that was advertised as permanent purchases will not be taken without just compensation in 2027. As a remedy, allow me to purchase a new Access MP3 player to use my music purchased through Access. This current statewide procedure of not allowing me to purchase a player to use my music is violating my constitutional rights.

Smith Grievance 870.

In her reply, defendant Washington contends that plaintiffs' grievances do not address the claims raised in this lawsuit. *See* Defendant's Reply (ECF No. 32). The Court agrees that plaintiff Byrd's grievance 876 did not properly exhaust his RLUIPA claim, because it did not mention a RLUIPA claim or any interference with the practice of his religion.[6]

However, the Court concludes that plaintiffs' grievances did address the Takings claim. Plaintiffs set forth a chronology which raised the claim in this lawsuit, *i.e.*, the government "took" their song downloads by using a "mortality timer" which expired in 2027. The grievance raises the issue from the prisoners' perspective: I spent money on music downloads for an MP3 player; my MP3 player will be inoperable in 2027; my MP3 player was confiscated; I want to

---

[6] The Court notes that defendants sometimes refer to Byrd's RLUIPA claim as a First Amendment Free Exercise claim. Defendant Washington's Brief (ECF No. 25, PageID.159). As discussed, Byrd's amended complaint seeks relief under RLUIPA, not the First Amendment. Amend. Compl. (ECF No. 20, PageID.138-144).

18

purchase a new MP3 player; and I want the MDOC to download the lost songs on my new MP3 player. In the Court's opinion, their grievances provided the MDOC with fair notice of their claim that defendants violated the Fifth Amendment's Taking Clause by taking their music downloads in 2027. As the court stated in *Bell v. Konteh*, 450 F.3d 651 (6th Cir. 2006):

> In describing the alleged mistreatment or misconduct, . . . we would not require a prisoner's grievance to allege a specific legal theory or facts that correspond to all the required elements of a particular legal theory. Rather, it is sufficient for a court to find that a prisoner's [grievance] gave prison officials fair notice of the alleged mistreatment or misconduct that forms the basis of the constitutional or statutory claim made against a defendant in a prisoner's complaint.

*Bell*, 450 F.3d at 654 (6th Cir. 2006), *quoting Burton v. Jones*, 321 F.3d 569, 575 (6th Cir. 2003).

That being said, plaintiffs do not prevail on exhaustion. As discussed, plaintiffs' Fifth Amendment Takings claims are meritless. In the alternative, even if plaintiffs had alleged a Takings claim, they failed to properly exhaust those claims. Both Byrd's grievance 876 and Smith's grievance 870 were rejected at Step I for raising a non-grievable issue. There is no evidence that plaintiffs appealed the rejections to Step II or Step III as required by the Policy Directive 03.02.130 ¶ I (eff. March 18, 2019), which provides that:

> A grievant whose grievance is rejected may appeal the rejection to the next step as set forth in this policy. A new grievance shall not be filed regarding the rejection.

Based on this record, plaintiffs failed to properly exhaust grievance nos. 870 and 876 because (1) the grievances were rejected at Step I for raising a non-grievable issue, and (2) plaintiffs failed to appeal the rejections through Step III. *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93. For these reasons, the Court should grant defendants' motions for summary judgment for lack of proper exhaustion.

### IV.     Recommendation

Accordingly, I respectfully recommend that plaintiffs' Fifth Amendment Takings claims be **DISMISSED** as to defendants Washington, Groves, and Access.

I further recommend that defendants Washington and Groves' motions for summary judgment (ECF Nos. 24 and 33) be **GRANTED**.

I further recommend that defendants Washington, Groves and Access be **DISMISSED** from this action.

I further recommend that this action be **TERMINATED**.


Dated:  March 1, 2021              /s/ Ray Kent
                                   United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).